**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

LAWRENCE BOSS,                          :
                                        :   Civil Action No. 10-5081 (JLL)
          Plaintiff,           :
                                        :
                                        :
          v.                   :        **OPINION**
                                        :
KENNETH SHARP, et al.,                  :
                                        :
          Defendants.          :

**APPEARANCES:**

          LAWRENCE BOSS, Plaintiff pro se
          #000220
          East Jersey State Prison, Special Treatment Unit
          CN 905, 8 Production Way
          Avenel, New Jersey 07001

**LINARES**, District Judge

     Plaintiff, Lawrence Boss, an involuntarily committed person

pursuant to the Sexually Violent Predator Act ("SVPA"), N.J.S.A.

30:4-27.24, et seq., seeks to bring this action in forma

pauperis.  Based on his affidavit of indigence, the Court will

grant plaintiff's application to proceed in forma pauperis

("IFP") pursuant to 28 U.S.C. § 1915(a) (1998) and order the

Clerk of the Court to file the Complaint.

     At this time, the Court must review the Complaint, pursuant

to 28 U.S.C. § 1915(e)(2), to determine whether it should be

dismissed as frivolous or malicious, for failure to state a claim

upon which relief may be granted, or because it seeks monetary

relief from a defendant who is immune from such relief.  For the reasons set forth below, the Court concludes that the Complaint should be dismissed without prejudice at this time.

Plaintiff also filed a motion for a preliminary injunction in this matter.  Because the action will be dismissed, the Court will deny preliminary injunctive relief accordingly as moot.

## I.   BACKGROUND

Plaintiff, Lawrence Boss ("Boss"), brings this civil rights action, pursuant to 42 U.S.C. § 1983, against the following defendants: Kenneth Sharp, Assistant Attorney General for the State of New Jersey; Debbie Hastings, Superintendent of the Special Treatment Unit ("STU") at the East Jersey State Prison ("EJSP"); Steven Johnson, Assistant Superintendent; Jennifer Velez, Commissioner of the New Jersey Department of Human Services ("NJDHS"); Merril Main, Clinical Director at the STU in EJSP; and John Main, Chief Director of NJDHS.  (Complaint, Caption and ¶¶ 4b-4f).  The following factual allegations are taken from the Complaint, and are accepted for purposes of this screening only.  The Court has made no findings as to the veracity of plaintiff's allegations.

The Court notes that this is the second action filed by Boss with regard to his civil confinement at the STU in EJSP.  His first action, Boss v. Dow, et al., Civil No. 10-2396 (JLL), was dismissed without prejudice by Opinion and Order issued by this

Court on or about December 7, 2010.[1]  Boss filed this instant
Complaint on or about October 1, 2010.

In this second action, Boss alleges that, on May 18, 2010,
it was brought to Steve Johnson's attention that the officers at
the EJSP were treating the residents transferred from the
Northern Regional Unit ("NRU") in Kearny, New Jersey, like
prisoners in segregation.  Boss also alleges that, on May 18,
2010, it had rained and water dripped from the ceiling in the
Unit where he is confined, leaving white spots on the floor when
it had dried.  (Complaint, ¶ 6, Statement of Claims).

On May 19, 2010, Boss complains that NJDHS staff
psychiatrists and psychologists moved their office supplies off
the EJSP compound to a location in Edison, New Jersey.  Boss
contends that this leaves the residents with no on-site
psychiatrist to talk to when needed.  (Id.).

On May 21, 2010, Boss alleges that he was told that the
South Unit was going to be separated from "population" because
the unit is for "troublemakers."  This designation apparently was
made based on a "hair scope psychopathy test."  Boss claims that
he has never been any trouble in the past eight years.  He

---

[1]  In his earlier action, Boss wrote to the Court on or
about December 21, 2010, asking to re-open his case.  However,
because the instant action asserts essentially the same claims,
as well as additional ones, it would be duplicative to re-open
the earlier action.

complains that this "label" conflicts with his attending group sessions. (Id.).

On May 27, 2010, Boss was pat searched and finger (ion) scanned when he came in from the yard. He complains that the search humiliates him and makes him feel like a problem prisoner. (Id.).

Boss further alleges that on June 1, 2010, residents at the EJSP STU were banned from going to the law library at the prison by orders of defendants Main and Johnson. As of July 26, 2010, the ban was still in effect. Boss also complains that his vitamins were rejected by EJSP officers and when he was given a grievance form to complain, it was on a form for use by prisoners. Boss alleges that his mail and packages are sent to Avenel rather than EJSP where he is confined. (Id.).

On August 25, 2010, an EJSP officer called plaintiff a "prisoner" when Boss complained about the count after visits. Boss alleges that this happens frequently (he says that a count was taken after visits on September 1, 2010), and as a civilly-committed person, he should not be treated like a prisoner. He states that he has sent many grievances about this problem. Boss also complained about the problem to Dr. Carson, who told plaintiff to submit a grievance. (Id.).

On September 13, 2010, the shower doors were removed from the shower facilities, where plaintiff now complains about a lack

4

of privacy.  On September 14, 2010, yard recreation time was cancelled.  Boss also alleges that his job and privileges will be taken from him if he does not attend group sessions, but he objects to the New Jersey Department of Corrections ("NJDOC") "conducting the running of group movements."  (Id.).

On or about December 22, 2010, rather than amending his pending action, Boss filed a third Complaint alleging continuing allegations related to the claims asserted herein, and naming several new defendants.[2]  See Boss v. Singer, et al., Civil No. 10-6576 (JLL).  Consequently, in a separate Order, this Court has directed the Clerk of the Court to file the new Complaint as an amended Complaint in this action, and administratively terminate Civil No. 10-6576 (JLL) as duplicative.  Accordingly, the Court will address the additional allegations set forth in the new (amended) Complaint.

First, Boss reiterates his allegations set forth in the instant action.  He then alleges that a bed bug exterminator came to the facility to spray on October 8, 2010, because of a bed bug outbreak.  Boss states that the exterminators come weekly to "fungate" the units.

---

[2]  Boss names the following new defendants as follows: Mark Singer, Deputy Attorney General; David L. Dacosta, Deputy Attorney General; Shantay Brame Adams, Assistant Unit Director at the EJSP STU; and Brian Friedman, Director of Psychology at EJSP STU.

Boss next states that he overheard two corrections officers on October 21, 2010, saying that "that's what happens when a celebrity is on our unit," meaning that therapy sessions are cancelled, unit searches and groups are conducted.  Boss complains that when he complained to defendant Adams, she stated that it is NJDOC policy.

Boss alleges that, on November 1, 2010, he received a memo that his electronics would be confiscated for a year.  He provides a copy of the memo, which includes memory sticks, flash drives, thumb drives, detachable or external drives, data storage devices, X-Box Elite, PS 3 (Play Station 3), Wii, and remote controls with digital read-out or viewing screens.  The memo states that these electronic devices compromise the security and orderly running of the institution.

On November 22, 2010, Boss states that he continued to complain about the NJDOC "dictating the therapy group movements indirectly facilitating the treatments."  His grievances in this regard go unanswered.  Finally, on November 27, 2010, Boss states that he was strip searched after visits.

Boss seeks to be transferred to "a federally funded facility" or a "better staff treatment facility under civil commitment."  He also asks to be compensated for mental anguish and for his psychological pain and suffering he has endured as a result of the defendants' alleged "cruel and unusual punishment"

since he was transferred to the EJSP STU.  (Complaint and amended Complaint at ¶ 7).

On or about October 20, 2010, Boss filed a motion for preliminary injunctive relief, namely, an injunction directing defendants not to retaliate against plaintiff by confiscating his court paper work or placing him in the Modified Activities Program ("MAP").

## II.  STANDARDS FOR A SUA SPONTE DISMISSAL

A district court is required to review a complaint in a civil action where the litigant is proceeding in forma pauperis. Specifically, the court is required to identify cognizable claims and to sua sponte dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief, pursuant to 28 U.S.C. § 1915(e)(2)(B).  Accordingly, because Boss is proceeding in forma pauperis in this matter, this action is subject to sua sponte screening for dismissal under 28 U.S.C. § 1915(e)(2)(B).

In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 93-94 (2007)(following Estelle v. Gamble, 429 U.S. 97, 106 (1976) and Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).  See also United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  The Court must "accept as true all of the allegations in the complaint and all

7

reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court need not, however, credit a pro se plaintiff's "bald assertions" or "legal conclusions."  Id.

A complaint is frivolous if it "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)).  The standard for evaluating whether a complaint is "frivolous" is an objective one. Deutsch v. United States, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

A pro se complaint may be dismissed for failure to state a claim only if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Haines, 404 U.S. at 521 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  See also Erickson, 551 U.S. at 93-94 (In a pro se prisoner civil rights complaint, the Court reviewed whether the complaint complied with the pleading requirements of Rule 8(a)(2).

However, recently, the Supreme Court revised this standard for summary dismissal of a Complaint that fails to state a claim in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009).  The issue before the Supreme Court was whether Iqbal's civil rights complaint adequately alleged defendants' personal involvement in discriminatory decisions regarding Iqbal's treatment during

detention at the Metropolitan Detention Center which, if true, violated his constitutional rights. Id. The Court examined Rule 8(a)(2) of the Federal Rules of Civil Procedure which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).[3] Citing its recent opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 555), the Supreme Court identified two working principles underlying the failure to state a claim standard:

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice ... . Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

Iqbal, 129 S.Ct. at 1949-1950 (citations omitted).

---

[3] Rule 8(d)(1) provides that "[e]ach allegation must be simple, concise, and direct. No technical form is required." Fed.R.Civ.P. 8(d).

The Court further explained that

> a court considering a motion to dismiss can choose to begin
> by identifying pleadings that, because they are no more than
> conclusions, are not entitled to the assumption of truth.
> While legal conclusions can provide the framework of a
> complaint, they must be supported by factual allegations.
> When there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether they
> plausibly give rise to an entitlement to relief.

Iqbal, 129 S.Ct. at 1950.

Thus, to prevent a summary dismissal, civil complaints must

now allege "sufficient factual matter" to show that a claim is

facially plausible.  This then "allows the court to draw the

reasonable inference that the defendant is liable for the

misconduct alleged."  Id. at 1948.  The Supreme Court's ruling in

Iqbal emphasizes that a plaintiff must demonstrate that the

allegations of his complaint are plausible.  Id. at 1949-50; see

also Twombly, 505 U.S. at 555, & n.3; Fowler v. UPMC Shadyside,

578 F.3d 203, 210(3d Cir. 2009).

Consequently, the Third Circuit observed that Iqbal provides

the "final nail-in-the-coffin for the 'no set of facts' standard"

set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957),[4] that

applied to federal complaints before Twombly.  Fowler, 578 F.3d

---

[4]  In Conley, as stated above, a district court was
permitted to summarily dismiss a complaint for failure to state a
claim only if "it appear[ed] beyond doubt that the plaintiff can
prove no set of facts in support of his claim which would entitle
him to relief.  Id., 355 U.S. at 45-46.  Under this "no set of
facts" standard, a complaint could effectively survive a motion
to dismiss so long as it contained a bare recitation of the
claim's legal elements.

at 210.  The Third Circuit now requires that a district court

must conduct the two-part analysis set forth in Iqbal when

presented with a motion to dismiss:

> First, the factual and legal elements of a claim should be
> separated.  The District Court must accept all of the
> complaint's well-pleaded facts as true, but may disregard
> any legal conclusions. [Iqbal, 129 S.Ct. at 1949-50].
> Second, a District Court must then determine whether the
> facts alleged in the complaint are sufficient to show that
> the plaintiff has a "plausible claim for relief." [Id.]  In
> other words, a complaint must do more than allege the
> plaintiff's entitlement to relief.  A complaint has to
> "show" such an entitlement with its facts.  See Phillips,
> 515 F.3d at 234-35.  As the Supreme Court instructed in
> Iqbal, "[w]here the well-pleaded facts do not permit the
> court to infer more than the mere possibility of misconduct,
> the complaint has alleged-but it has not 'show [n]'-'that
> the pleader is entitled to relief.'"  Iqbal, [129 S.Ct. at
> 1949-50].  This "plausibility" determination will be "a
> context-specific task that requires the reviewing court to
> draw on its judicial experience and common sense." Id.

Fowler, 578 F.3d at 210-211.

This Court is mindful, however, that the sufficiency of this

pro se pleading must be construed liberally in favor of

Plaintiff, even after Iqbal.  See Erickson v. Pardus, 551 U.S. 89

(2007).  Moreover, a court should not dismiss a complaint with

prejudice for failure to state a claim without granting leave to

amend, unless it finds bad faith, undue delay, prejudice or

futility. See Grayson v. Mayview State Hosp., 293 F.3d 103, 110-

111 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 117 (3d Cir.

2000).

### III.   SECTION 1983 ACTIONS

Boss brings this action pursuant to 42 U.S.C. § 1983.

Section 1983 provides in relevant part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory ... subjects, or causes to be subjected,
> any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other
> proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must
allege, first, the violation of a right secured by the
Constitution or laws of the United States and, second, that the
alleged deprivation was committed or caused by a person acting
under color of state law.  West v. Atkins, 487 U.S. 42, 48
(1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir.
1994).

### IV.   THE NEW JERSEY SEXUALLY VIOLENT PREDATOR ACT

The New Jersey SVPA, N.J.S.A. 30:4-27.24 *et seq.*, provides
for the custody, care and treatment of involuntarily committed
persons who are deemed to be sexually violent predators ("SVP").
N.J.S.A. 30:4-27.26.  The New Jersey Department of Corrections
("DOC") operates the facilities designated for SVPs, N.J.S.A.
30:4-27.34(a); and the New Jersey Department of Human Services
("DHS") provides for their treatment.  N.J.S.A. 30:4-27.34(b).
The SVPA was amended in 2003 to require that regulations be
promulgated jointly by the DOC and the DHS, in consultation with

12

of the Attorney General, taking "into consideration the rights of the patients as set forth in section ten of P.L. 1965, c. 59 (C. 30:4-24.2) ... [to] specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators." N.J.S.A. 30:4-27.34(d).

In passing the SVPA, the New Jersey Legislature made specific findings regarding SVPs. N.J.S.A. 30:4-27.25. The Legislature noted that it was necessary to modify the previous civil commitment framework and additionally separate SVPs from other persons who have been civilly committed. Id. The SVPA defines a SVP as:

> ... a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

N.J.S.A. 30:4-27.26(b).

Those persons committed under the SVPA shall receive annual review hearings. N.J.S.A. 30:4-27.35. A SVP may be released from involuntary civil commitment upon recommendation of the DHS or by the SVP's own petition for discharge. N.J.S.A. 30:4-27.36.

## V.  ANALYSIS

### A.  Transfer to Prison Facility Claim

Boss again seems to reiterate his primary complaint that he has been transferred to a prison facility, as a civilly committed person under the SVPA, and that such placement is

unconstitutional where he is subject to the prison policies in place for the orderly operation and security of a prison facility.  Boss raised this claim in his first action, Civil No. 10-2396 (JLL).  The Court dismissed this claim, with prejudice, in the Opinion and Order issued on or about December 7, 2010, based on the Supreme Court's ruling in Kansas v. Hendricks, 521 U.S. 346 (1997).

In Kansas v. Hendricks, the Supreme Court examined the conditions of confinement provided by Kansas' Sexually Violent Predator Act.  The Act called for the confinement of sexually violent predators in a secure facility because they were dangerous to the community.  Id., 521 U.S. at 363-64.  Pertinent here, the Supreme Court was aware that the sexually violent predators in Kansas were to be held in a segregated unit within the prison system.  However, the Court noted that the conditions within the unit were essentially the same as conditions for other involuntarily committed persons in mental hospitals.  Moreover, confinement under the Act was not necessarily indefinite in duration, and the Act provided for treatment.  Id., 521 U.S. at 363, 364, 365-368.  Thus, the Supreme Court held that involuntary confinement under Kansas' SVPA was not unconstitutional so long as such civilly-confined persons are segregated from the general prison population and afforded the same status as others who have been civilly committed.  Id., 521 U.S. at 368-69.  See also

14

<u>Seling v. Young</u>, 531 U.S. 250, 261062 (2001)(holding same with respect to the State of Washington's SVPA).

Here, the New Jersey SVPA is essentially the same as the Kansas and Washington SVP statutes that were examined and upheld as constitutional by the Supreme Court in <u>Hendricks</u> and <u>Seling</u>, respectively.[5]  <u>See</u> <u>Bagarozy v. Goodwin</u>, Civil Action No. 08-468 (SRC), 2008 WL 4416455, *7-8 (D.N.J. Sept. 23, 2008); <u>In re Commitment of W.Z.</u>, 173 N.J. 109, 801 A.2d 205, 211 (2002). Therefore, this Court finds that Boss' placement and confinement in a Special Treatment Unit for SVP residents that is a segregated unit in the East Jersey State Prison, does not, in and of itself, violate the U.S. Constitution's Due Process Clause or the Eighth Amendment's prohibition against cruel and unusual punishment.  Accordingly, Boss' claim that his continued confinement in a segregated unit within a prison facility is unconstitutional must be dismissed for failure to state a cognizable claim of a constitutional deprivation.

B.  <u>Conditions of Confinement Claim</u>

Although plaintiff's placement in a segregated unit within a prison facility is not, in and of itself, a constitutional

---

[5]  Recently, the Supreme Court held constitutional under the Necessary and Proper Clause, a federal statute that allowed a district court to order the civil commitment of a sexually dangerous federal prisoner beyond the date the prisoner would otherwise be released.  <u>United States v. Comstock</u>, No. 08-1224, __ U.S. __, 130 S.Ct. 1949 (May 17, 2010).  Although these civilly committed persons remained confined at a federal prison, namely, FCI Butner, the Court did not address their place of civil confinement as being unconstitutional.

violation, Boss makes additional allegations concerning the conditions of confinement at the EJSP facility.  For instance, he complains that he will be housed in a prison facility subject to restrictions.  See Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982)("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

Generally, the Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment, Bell v. Wolfish, 441 U.S. 520, 536 (1979),[6] within the bounds of professional discretion, Youngberg, 457 U.S. at 321-22.  Specifically, in Youngberg, the Supreme Court held that civilly committed persons do have constitutionally protected interests, but that these rights must be balanced against the reasons put forth by the State for restricting their liberties. Id. at 307.  The Constitution is not concerned with de minimis restrictions on patients' liberties.  Id. at 320.  Moreover, "due process requires that the conditions and duration of confinement [for civilly confined persons] bear some reasonable relation to the purpose for which persons are committed."  Seling, 531 U.S.

---

[6]  In Bell v. Wolfish, the Supreme Court held that whether a condition of confinement of pretrial detainees violated their constitutional rights turns on whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate government purpose.  441 U.S. 520, 535-39, (1979).

at 265.  While the nature of an SVP's confinement may factor in this balance of what is reasonable, it is clearly established that the substantive due process protections of the Fourteenth Amendment apply to SVPs. See Andrews v. Neer, 253 F.3d 1052, 1061 (8th Cir. 2001)(applying the Fourteenth Amendment's "objective reasonableness" standard to excessive force claims brought by civilly committed SVPs).

Boss' main allegation with respect to the conditions of his confinement relates to his contention that he is now housed in a prison facility and has been treated like a prisoner and subjected to prison rules.  For instance, he complains that he has been subjected to searches after he has come from the yard or visits.  He also alleges that he is subject to a memo that states certain electronic devices will be confiscated and are disallowed at EJSP.  Movement to group sessions are controlled by the prison staff, mail is sent to a different location, and any resident who complains will be placed in MAP status.  Boss also alleges that the ceiling leaks when it rains.

The Third Circuit has held that placement of a civilly committed SVP in segregated confinement does not violate due process unless the deprivation of liberty is in some way extreme. See Deavers v. Santiago, 243 Fed. Appx. 719, 721 (3d Cir. 2007)(applying Sandin v. Conner, 515 U.S. 472 (1995),[7] to

_____

[7] In Sandin, the Supreme Court held that there was no cognizable liberty interest in freedom from additional restraint in a prison setting.  See 515 U.S. at 486 ("We hold that [the

segregated confinement of civilly committed SVPs).  See also
Thielman v. Leean, 282 F.3d 478 (7th Cir. 2002)(likewise
extending Sandin to civil commitment settings).  Thus, Boss'
general allegation that disruptive and agitative residents may be
placed in MAP status, and that general movement is monitored and
restricted, without more, fails to articulate a cognizable claim
of constitutional magnitude, in light of Deavers.  Boss fails to
allege any facts to show that MAP restrictions and movements
within the EJSP facility are unduly extreme and unrelated to the
purposes for which such restrictions are imposed.

Additionally, for the following reasons, this Court finds
that Boss' complaints about the mail restrictions, searches, and
confiscation of electronic devises are not extreme conditions of
plaintiff's confinement as a civilly committed person, and thus,
do not violate due process.

1.  *Unlawful Search Claim*

Boss alleges that he is subjected to a "pat down" search and
ion finger search when he leaves his unit at EJSP, for yard
recreation.  He also states that he was strip searched on one
occasion after a "p.m. visit."  It would appear that plaintiff is
asserting that as a civilly committed person, such searches are
unconstitutional and violate his rights under the Fourth
Amendment.

---

prisoner's] discipline in segregated confinement did not present
the type of atypical, significant deprivation in which a State
might conceivably create a liberty interest.").

18

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. CONST. amend. IV.  Reasonableness under the Fourth Amendment "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 618 (1988)(quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)).  "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. at 619 (quotation marks and internal citation omitted).

In Hudson v. Palmer, 468 U.S. 517, 530 (1984), a prisoner argued that a cell search conducted to harass him was unreasonable because a prisoner has a reasonable expectation of privacy not to have his cell, locker, personal effects, person invaded for such a purpose. Id. at 529.  The Supreme Court rejected the claim because "prisoners have no legitimate expectation of privacy." Id. at 530.  The Court observed that:

> A right of privacy in traditional Fourth Amendment terms is
> fundamentally incompatible with the close and continual
> surveillance of inmates and their cells required to ensure
> institutional security and internal order.... [S]ociety
> would insist that the prisoner's expectation of privacy
> always yield to what must be considered the paramount
> interest in institutional security.... [I]t is accepted by
> our society that loss of freedom of choice and privacy are
> inherent incidents of confinement.

Id. at 527-28 (footnotes, citations and internal quotation marks omitted).  The same conclusion was reached with respect to pretrial detainees other than convicted prisoners.  See Bell v. Wolfish, 441 U.S. 520, 558-560 (1979)(finding that a body cavity searches of pretrial detainees do not violate the Fourth Amendment).[8]

Consequently, involuntarily committed patients and SVPs, like pretrial detainees, are entitled to some protection under the Fourth Amendment, but they do not have an expectation of privacy equal to an individual in society generally.  See Serna v. Goodno, 567 F.3d 944, 948 (8th Cir. 2009)(noting that pretrial detainees are kept in custody because there is cause to believe they are dangerous; similarly, commitment under Minnesota law as a sexually dangerous person requires a finding of dangerousness), cert. denied, 130 S.Ct. 465 (2009); Allison v. Snyder, 332 F.3d 1076-79 (7th Cir. 2003)(SVPs may be subjected to conditions that advance goals such as preventing escape and assuring the safety

---

[8]  In Bell v. Wolfish, the United States Supreme Court, in determining the constitutionality of post-visitation body cavity searches, held that a reasonableness test should be employed when examining the constitutionality of a search that encroaches upon the personal privacy of an inmate and the integrity of the inmate's body.  In other words, courts must balance the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.  441 U.S. 520, 559 (1979); see also Turner v. Safley, 482 U.S. 78 (1987) (a prison regulation which infringes upon an inmate's constitutionally recognized right is valid only if it is reasonably related to a legitimate penological interest).

of others, even though they may not technically be "punished"), cert. denied, 540 U.S. 985 (2003); Aiken v. Nixon, 236 F. Supp.2d 211, 233 (N.D.N.Y. 2002), aff'd 80 Fed. Appx. 146 (2d Cir. 2003); see also, Jennings v. New York State Office of Mental Health, 786 F. Supp. 376, 382, 384 (S.D.N.Y. 1992), aff'd, 977 F.2d 731 (2d Cir. 1992).

Similarly, the United States Court of Appeals for the Ninth Circuit has held that, because SVPs have been civilly committed subsequent to criminal convictions and have been adjudged to pose a danger to the health and safety of others, they are subject to "[l]egitimate, non-punitive government interests" such as "maintaining jail security, and effective management of [the] detention facility." Jones v. Blanas, 393 F.3d 918, 932 (9th Cir. 2004). Thus, the reasonableness of a particular search or seizure is determined by reference to the detention context and is a fact-intensive inquiry. Id.

Here, with respect to his Fourth Amendment claim, Boss' primary argument appears to be that any prison actions that did not specifically take into account his classification as a SVP is per se a constitutional violation. Applying the balancing test employed by Wolfish, this Court finds that the manner and place in which Boss was pat-searched and finger-scanned were plainly reasonable and did not violate his Fourth Amendment rights. First, the pat search and finger scan were conducted when Boss was leaving and returning to his unit from yard time. See Semler

v. Ludeman, 2010 WL 145275, *19, D. Minn. Jan. 8, 2010)(finding no Fourth Amendment violation where plaintiffs were required to submit to pat searches following gym use and kitchen work assignments that included removal of socks and shoes, opening their mouths, showing their zippers, showing behind their ears and running their fingers through their hair; search was "not highly intrusive" and was "not unlike the scope of searches of the general public at airport security checkpoints).  See also Serna v. Goodno, 567 F.3d 944, 955-56 (upholding reasonableness of a facility-wide visual body cavity search after a cell phone case (cell phones considered contraband) was found, because, while invasive, the searches were conducted privately, safely, and professionally, and the facility was reacting to a recurring problem involving contraband cell phones0, cert. denied, 130 S. Ct. 465 (Oct. 20, 2009).

Moreover, there are no allegations that the guards conducted the pat search and finger scan in a menacing or degrading manner. Lopez does not allege that there was physical force used or that the search was done in a menacing manner.  See Kitchens v. Mims, 2010 WL 1240980 (E.D.Cal. March 25, 2010).

Likewise, the single strip search incident fails to state a claim of constitutional magnitude.  The strip search was done after visitation.  Boss also does not allege that the search was performed in a degrading manner, that physical force was used, or that it was conducted solely for the purpose of punishment.

Therefore, based on all of these factors, this Court will dismiss Boss' Fourth Amendment unlawful search claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), for failure to state a cognizable claim under § 1983.

2. *Interference With Mail*

Next, Boss seems to complain that his mail must be sent to Avenel rather than directly to the EJSP unit.  The Court perceives this claim as asserting a violation of plaintiff's First Amendment rights.  However, Boss does not indicate that he has not received mail or packages, or that his mail has been opened outside his presence, except on one occasion when he was not allowed to receive a package of vitamins.

As a general rule, inmates have a limited liberty interest in their mail under the First and Fourteenth Amendments.  <u>Jones v. Brown</u>, 461 F.3d 353, 358 (3d Cir. 2006), <u>cert</u>. <u>denied</u>, 549 U.S. 1286 (2007).[9]  However, an inmate's constitutional right to

---

[9]  In <u>Jones v. Brown</u>, the United States Court of Appeals for the Third Circuit held that the legal mail policy of state prison in opening legal mail outside the presence of the inmate violated the inmate's First Amendment right to freedom of speech, and was not reasonably related to prison's legitimate penological interest in protecting health and safety of prisoners and staff. 461 F.3d at 358.  The Third Circuit also has held that "a pattern and practice of opening properly marked incoming court mail outside an inmate's presence infringes communication protected by the right to free speech.  Such a practice chills protected expression and may inhibit the inmate's ability to speak, protest, and complain openly, directly, and without reservation with the court." <u>Bieregu v. Reno</u>, 59 F.3d 1445, 1452 (3d Cir. 1995) (applying the <u>Turner</u> analysis), <u>implied overruling on other grounds recognized in</u> <u>Oliver v. Fauver</u>, 118 F.3d 175, 177–78 (3d Cir. 1997). Thus, the assertion that legal mail is intentionally opened and read, delayed for an inordinate period of time, or

send and receive mail may be restricted for legitimate penological interests.  See Thornburgh v. Abbott, 490 U.S. 401, 407 (1989); Turner v. Safley, 482 U.S. 78, 89 (1987).  In Turner, the Supreme Court of the United States found that a prison regulation infringing on an inmate's constitutional rights is valid so long as it is reasonably related to a legitimate penological interest.  Id. at 89.  The Court established a balancing test pursuant to which courts analyze prohibitions on prisoners' exercise of their constitutional rights by considering the following four factors: (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising that right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives available that continue to serve the prison's interest without impinging constitutional rights. Turner, 482 U.S. at 89-91.  The Court also recognized that deference should be given to the decisions of prison administrators, especially when those decisions deal with issues of prison safety and security.   Id.

The United States Court of Appeals for the Third Circuit has applied Turner in analyzing constitutional claims by civily

---

stolen may state a First Amendment claim.  See, e.g., Antonelli v. Sheahan, 81 F.3d 1422, 1431-32 (7th Cir. 1996); Castillo v. Cook County Mail Room Dep't, 990 F.2d 304 (7th Cir. 1993).

committed SVPs.  See Rivera v. Rogers, 224 Fed. Appx. 148, 2007
WL 934413 (3d Cir. March 29, 2007)(applying Turner in analyzing
claims of SVPs that opening of their packages violated their
First Amendment rights).  Other courts likewise have applied
Turner when analyzing claims brought by civilly committed SVPs
alleging First Amendment violations.[10]  See Willis v. Smith, 2005
WL 550528 (N.D. Iowa Feb. 28, 2005)(noting that status of SVPs
was substantially similar to that of prisoners and applying
Turner to SVP claims concerning mail handling procedures); Ivey
v. Mooney, 2008 WL 4527792, at *4 n. 7 (D. Minn. Sept. 30,
2008)(applying Turner, but noting that a civil confinement is
significantly different from a criminal confinement); Francis v.
Watson, 2006 WL 2716452, at *3 (D.S.C. Sept. 22, 2006)(citing
cases that have applied Turner in cases involving civilly
confined persons); Marsh v. Liberty Behavioral Health Care, Inc.,
2008 WL 821623, at *5 (M.D. Fla. Mar. 27, 2008), aff'd 330 Fed.
Appx. 179 (11th Cir. 2009); Beaulieu v. Ludeman, 2008 WL 2498241,
at *20 (D. Minn. June 18, 2008).

In Rivera, the Third Circuit affirmed the district court's
ruling that a facility housing civilly committed SVPs has a

---

[10]  Essentially, the First Amendment analysis under Turner
mirrors the due process analysis under Youngberg; in both
instances, courts must balance the constitutional interests of
confined persons against the legitimate interests of the state-
run institution in which they reside.  See Beaulieu v. Ludeman,
2008 WL 2498241, at *20 n. 15 (finding Turner to be consistent
with Youngberg because "it will not allow a Program detainee's
right to be restricted unless there is a valid institutional
reason for doing so").

legitimate interest in both the safety of its facility and the rehabilitation of its patients.  Rivera, 224 Fed. Appx. at 151 (citing Waterman v. Farmer, 183 F.3d 208, 215 (3d Cir. 1999)("[I]t is beyond dispute that New Jersey has a legitimate penological interest in rehabilitating its most dangerous and compulsive sex offenders.")).  Specifically, the court upheld as constitutional the STU's policy that allows staff to open packages not marked as "legal mail" to assure that the packages do not contain contraband (i.e., items either harmful to staff and residents, or detrimental to rehabilitation).  The court found that plaintiff was free to send and receive mail so long as the content of his mail was not sexually explicit.  Moreover, the Third Circuit found no error in the district court's conclusion that there were no ready alternatives to mail security and that the STU's policy appeared to be the only viable alternative, thus supporting the reasonableness of the mail policy.  Rivera, 224 Fed. Appx. at 151.

Here, this Court likewise finds that it is beyond dispute that the staff at EJSP, where plaintiff and other SVP residents are newly housed, has a legitimate interest in both the safety of its facility and rehabilitating its patients.  As noted above, these civilly committed persons are convicted sexual predators, which makes safety at EJSP a very important concern.  The staff clearly must determine if any items coming through the mail pose a threat to the safety of the staff or the other residents.  They

26

also must decide if any of the materials passing through the mail could be detrimental to a resident's therapy. Consequently, as set forth by the Supreme Court and the Third Circuit, the Court must defer to the prison officials when it comes to issues of managing a safe and operational prison facility. In this case, delivery of letters and packages at the Avenel facility located close by, where the staff is trained with respect to SVP issues unlike the general NJDOC staff at EJSP, assures that harmful materials are not being passed through the mail, but also allows for specialized treatment regarding SVP residents. This new policy, which appears to be preliminarily instituted because of the recent transfer of the SVP residents to EJSP, clearly bears a rational relationship to both interests discussed above.

Moreover, in his interference with the mail claim, Boss alleges a single incident where his package was not delivered to him. A single interference with the delivery of an inmate's personal mail, without more, does not rise to the level of a constitutional deprivation. Morgan v. Montayne, 516 F.2d 1367 (2d Cir. 1975), cert. denied, 424 U.S. 973 (1976). Thus, the only continuing complaint seems to be that his mail is sent to another facility instead of EJSP where he now resides. Boss does not articulate a claim that prison officials are intentionally delaying or opening his mail. Therefore, the Court will dismiss this claim without prejudice at this time.

3.  *Confiscation of Electronic Devices*

Boss also complains about a new policy memo issued on November 1, 2010 that restricts certain electronic equipment (memory sticks; flash drives; thumb drives; detachable or external drives; data storage devices; X-box Elite, Play Station 3 and Wii game systems; and remote controls with digital read out or viewing screens) for SVP residents in the EJSP STU.  He complains that anyone in possession of such electronic devices will have such equipment confiscated in violation of his constitutional rights.  It would appear that plaintiff is asserting a deprivation of property claim and/or a First Amendment violation.

This Court finds that a First Amendment claim, if asserted, is governed by the standard in Turner v. Safely, supra, which sets out the standard for challenges to regulations that restrict a prisoner's fundamental constitutional rights.  Although the courts have not defined the contours of a civilly detained person's right to free speech, Boss' rights are at least co-extensive with the rights of prisoners with respect to institutional regulations that curtail First Amendment rights. E.g., City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983)("[T]he due process rights of a [pretrial detainee or other persons in state custody] are at least as great as the Eighth Amendment protections available to a convicted prisoner").

Thus, a Turner analysis is applicable here despite the fact that plaintiff is not a prisoner.  See e.g., Bell v. Wolfish, 441 U.S. at 545-46 ("A detainee simply does not possess the full range of freedoms of an unincarcerated individual" because "[t]he fact of confinement as well as the legitimate goals and policies" of the institution limit constitutional rights.); Allison v. Snyder, 332 F.3d 1076, 1079 (7th Cir. 2002)(persons confined as sexually violent "may be subjected to the ordinary conditions of confinement").

In the prison setting, regulations that restrict a prisoner's access to use and own electronic equipment are "valid [if they] are reasonably related to legitimate penological interests."  Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (citing Turner, 482 U.S. at 89).  Applying the Turner rule to an institutional setting such as EJSP, institution regulations that restrict a patient's First Amendment rights are valid if they are reasonably related to a legitimate institutional interests, such as maintaining security, preserving internal order and rehabilitation.  McKune v. Lile, 536 U.S. 24, 36 (2002) ("[R]ehabilitation is a legitimate penological interest that must be weighed against the exercise of an inmate's liberty."); Turner, 482 U.S. at 91 (rehabilitation and maintaining security are legitimate penological interests); Allison, 332 F.3d at 1079 (preventing escape and assuring safety of others are legitimate institutional interests).

Here, this Court finds that the first <u>Turner</u> factor is satisfied because the EJSP STU new rule prohibiting these delineated electronic devices are reasonably related to the legitimate institutional interests of security and the orderly running of the EJSP.  The November 1, 2010 memo regarding the new rule, which was attached by plaintiff to his Complaint, expressly states that security and orderly operation of the facility is the purpose of the rule change.  Indeed, this Court finds that EJSP STU has a legitimate interest in maintaining security of its facility by preventing residents from improperly using computers to engage in fraud, extortion and other criminal activity and preventing discord that could occur between residents owning the electronic equipment targeted with those who do not.  <u>See</u> <u>Semler v. Ludeman</u>, 2010 WL 145275, *9-16 (D. Minn. Jan. 8, 2010) (institution rules governing media, mail, personal property, telephone access and association between patients confined as sexually violent persons are valid under <u>Turner</u> because they are reasonably related to legitimate security and rehabilitative interests); <u>Spicer v. Richards</u>, 2008 WL 3540182, *7-8 (W.D. Wash. Aug. 11, 2008)(state facility for civil detainee's "ban on the possession of electronic devices is reasonably related to the security and safety risks posed to [its] residents, staff, visitors, and the public," and therefore not violative of civil detainee's constitutional rights).  In addition, the EJSP STU has an interest in promoting rehabilitation and a therapeutic

environment by preventing patients from accessing pornography, contacting their victims, viewing movies that may reinforce cognitive distortions or sexual deviance and playing video games that may encourage anti-social or obsessive behavior.  See Hedgespeth v. Bartow, 2010 WL 2990897 at *6-7 (W.D. Wisc. July 27, 2010).

Moreover, defendants have a legitimate security interest in making uniform rules regarding property ownership and media restrictions to prevent discord, extortion and unauthorized property exchanges among patients, as well as legitimate security and rehabilitative interests in keeping potential damaging materials out of the institution altogether.  See Allison, 332 F.3d at 1079 (security is legitimate institutional interest); Hedgespeth, 2010 WL 2990897 at *8.

The third Turner factor also weighs heavily in favor of the defendants' new electronic restrictions.  Allowing residents to own digital storage devices, video game systems and the other listed electronic devices would be a security, treatment and administrative nightmare.  Security staff would need to screen each resident's electronic equipment for unauthorized content regularly and frequently.  Additionally, because it is relatively easy to hide and transfer digital files by these restricted devices, some residents likely would succeed in caching and accessing unlawful or counter-therapeutic data.  Thus, unrestricted access to the internet and video games at EJSP STU

likely would interfere with the efforts to treat the patients and operate the facility in a secure and orderly manner.  Hedgespeth, supra.

Finally, this Court notes that Boss has failed to articulate any reason or alternative that would refute the clearly expressed security need for the new restriction on electronic devices.  He simply states a legal claim that his constitutional rights will be violated without any factual support.  Such claim does not pass muster for statement of a claim under the Iqbal standard.

Facilities that house and deal with residents who have been involuntarily committed for sexual disorders are "'volatile' environments whose day-to-day operations cannot be managed from on high."  Thielman v. Leean, 282 F.3d 478, 483 (7th Cir. 2002). Courts must presume that the judgment exercised by the appropriate professionals in these facilities is reasonable.  Id. (citing Youngberg v. Romeo, 457 U.S. 307, 312-24 (1982) (extending "professional judgment" standard to substantive due process claim brought by involuntarily committed mental patient and noting that such a presumption was "necessary to enable institutions of this type-often, unfortunately, overcrowded and understaffed-to continue to function"); see also Hedgespeth, 2010 WL 2990897 at *9.  Accordingly, this Court finds that Boss has failed to state a claim of constitutional magnitude in this regard.

Finally, to the extent that plaintiff is raising a deprivation of property claim, his claim must be dismissed for failure to state a claim.  The Fourteenth Amendment provides, in pertinent part here, that the State may not "deprive any person of life, liberty, or property, without due process of law[.]" The "due process of law" essentially requires that the government provide a person notice and opportunity to be heard in connection with the deprivation of life, liberty or property.  Zappan v. Pennsylvania Board of Probation and Parole, 152 Fed. Appx. 211, 220 (3d Cir. 2005)("The essential requirements of any procedural due process claim are notice and the opportunity to be heard."). Hence, to establish a prima facie case of a procedural due process violation, a plaintiff must establish: (1) a deprivation of a constitutionally protected liberty or property interest, (2) state action, and (3) constitutionally inadequate process.  See Rusnak v. Williams, 44 Fed. Appx. 555, 558 (3d Cir. 2002) ("Procedural due process claims, to be valid, must allege state sponsored-deprivation of a protected interest in life, liberty or property.  If such an interest has been or will be deprived, procedural due process requires that the governmental unit provide the individual with notice and a reasonable opportunity to be heard.")(citation omitted).

To have a property interest, Boss must demonstrate "more than an abstract need or desire for it. ... He must, instead, have a legitimate claim of entitlement to it" under state or

33

federal law.  Board of Regents v. Roth, 408 U.S. 564, 577 (1972).

For present purposes, a procedural due process analysis involves

a two step inquiry: the first question to be asked is whether the

complaining party has a protected liberty or property interest

within the contemplation of the Due Process clause of which he

has been deprived and, if so, the second question is whether the

process afforded the complaining party to deprive him of that

interest comported with constitutional requirements.  Shoats v.

Horn, 213 F.3d 140, 143 (3d Cir. 2000).

Here, as demonstrated above, the restrictions on electronic

devices are neither arbitrary or capricious, but plainly were

implemented in order to address the security and operational

concerns of a prison facility, which also houses civilly

committed sex offenders.  Boss has not demonstrated a

constitutionally-recognized property interest in the continued

possession of unrestricted electronic devices necessary to

satisfy the threshold requirement of a deprivation of property

interest.  See Semler v. Ludeman, 2010 WL 145275, *25 (D. Minn.

Jan. 8, 2010).

Furthermore, to the extent that Boss may have electronic

equipment confiscated, as alleged (although he does not

articulate that he actually possesses these restricted items), he

has a post-deprivation remedy.  Property loss caused by the

intentional acts of government officials does not give rise to a

procedural due process claim under § 1983 where a post-

34

deprivation remedy satisfying minimum procedural due process requirements is available under state law.  See Parratt v. Taylor, 451 U.S. 527 (1981) (overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)); see also Zinermon v. Burch, 494 U.S. 113, 115 (1990); Hudson v. Palmer, 468 U.S. 517 (1984); Holman, 712 F.2d at 856.[11]  The New Jersey Tort Claims Act ("NJTCA"), N.J. STAT. ANN. § 59:1-1 et seq., provides a post-deprivation judicial remedy to persons who believe they were deprived of property at the hands of the State or local government.  See  Holman, 712 F.2d at 857; Asquith v. Volunteers of America, 1 F. Supp.2d 405, 419 (D.N.J. 1998), aff'd 186 F.3d 407 (3d Cir. 1999).

Therefore, any deprivation of property claim asserted by Boss here will be dismissed with prejudice for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

4.  *Unsanitary Conditions*

Finally, Boss alleges that his unit has leaking ceilings when it rains, which leave white spots on the floor when the water dries.  He also complains about a bed bug infestation, but

---

[11]  In Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982), the Supreme Court explained, however, that post-deprivation remedies do not satisfy the Due Process Clause if the deprivation of property is accomplished pursuant to established state procedure rather than through random, unauthorized action.  455 U.S. at 435-36.  But see Tillman v. Lebanon Co. Correctional Facility, 221 F.3d 410, 421 n.12 (3d. Cir. 2000)(citing United States v. James Daneil Good Real Property, 510 U.S. 43, 53 (1993))(in "extraordinary situations" such as routine deduction of fees from a prisoner's account even without authorization, post-deprivation remedies may be adequate).

admits that extermination services have been contracted on a weekly basis to address and remedy the problem.  He does not contend that these conditions are intended as punishment, or that he has suffered adversely from these alleged conditions.  Based on these general allegations, even if true, the Court finds no atypical or significant deprivation that would rise to the level of a constitutional violation at this time.

Therefore, with respect to his conditions claims as alleged, this Court finds that Boss has failed to state a cognizable claim in this regard at this time, and the alleged conditions of confinement claims will be dismissed without prejudice.  To the extent that Boss can allege additional facts to show that unconstitutional conditions of confinement exist, he may seek leave to re-open this case and file an amended pleading.[12]

C.  Access to Law Library Claim

This Court next considers plaintiff's allegations that he has been denied access to the courts (via denial of access to the law library) in violation of his First and Fourteenth Amendment

---

[12]  Should plaintiff so choose to amend his Complaint to cure the deficiencies noted herein, pursuant to Federal Rule of Civil Procedure 15, Boss should note that when an amended complaint is filed, the original complaint no longer performs any function in the case and "cannot be utilized to cure defects in the amended [complaint], unless the relevant portion is specifically incorporated in the new [complaint]."  6 Wright, Miller & Kane, Federal Practice and Procedure § 1476 (2d ed. 1990) (footnotes omitted).  An amended complaint may adopt some or all of the allegations in the original complaint, but the identification of the particular allegations to be adopted must be clear and explicit.  Id.  To avoid confusion, the safer course is to file an amended complaint that is complete in itself.  Id.

rights.  Courts have recognized different constitutional sources for the right of access to the courts.  Principally, the right of access derives from the First Amendment's right to petition and the due process clauses of the Fifth and Fourteenth Amendments.[13] The right of access to the courts requires that "adequate, effective, and meaningful" access must be provided inmates who wish to challenge their criminal charge, conviction, or conditions of confinement.  Bounds v. Smith, 430 U.S. 817, 822 (1977).  In other words, prison officials must "give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the Courts."  Id. at 825. "'[T]he touchstone ... is meaningful access to the courts.'" Peterkin v. Jeffes, 855 F.2d 1021, 1037 (3d Cir. 1988)(quoting Bounds, 430 U.S. at 823)(internal quotation omitted).

---

[13] The right of access to the courts is an aspect of the First Amendment right to petition.  McDonald v. Smith, 472 U.S. 479, 482 (1985); Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741 (1983); Milhouse v. Carlson, 652 F.2d 371, 373 (3d Cir. 1981).  The Supreme Court also found that "[t]he constitutional guarantee of due process of law has as a corollary the requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights."  Procunier v. Martinez, 416 U.S. 396, 419 (1974), overruled on other grounds, Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989).  See also, Hudson v. Palmer, 468 U.S. 517, 523 (1984)("prisoners have the constitutional right to petition the Government for redress of their grievances, which includes a reasonable right of access to the courts"); Bounds v. Smith, 430 U.S. 817 (1977); Wolff v. McDonnell, 418 U.S. 539, 576 (1974).  The right of access to the courts might also arise under the Sixth Amendment's right to counsel; however, under the circumstances of the present case, the Sixth Amendment clearly is not implicated.

In Bounds, the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."  The right of access to the courts is not, however, unlimited.  "The tools [that Bounds] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."  Lewis v. Casey, 518 U.S. 343, 355 (1996) (emphasis in original).  Similarly, a pretrial detainee has a right of access to the courts with respect to legal assistance and participation in one's own defense against pending criminal charges.  See, e.g., May v. Sheahan, 226 F.3d 876, 883-84 (7th Cir. 2000); Caldwell v. Hall, 2000 WL 343229 (E.D. Pa. March 31, 2000).  But see United States v. Byrd, 208 F.3d 592, 593 (7th Cir. 2000) (pretrial detainee who rejects an offer of court-appointed counsel in satisfaction of the Sixth Amendment right to counsel has no alternative right to access to a law library); Wilson v. Blankenship, 163 F.3d 1284, 1290-91 (11th Cir. 1998) (same); United States v. Walker, 129 F.3d 1266, 1997 WL 720385, **4 (6th Cir. 1997) (same).

Moreover, a prisoner alleging a violation of his right of access must show that prison officials caused him past or imminent "actual injury" by hindering his efforts to pursue such a claim or defense.  See Lewis, 518 U.S. at 348-51, 354-55 (1996); Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir. 1997). "He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known.  Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable to file even a complaint."  Lewis, 518 U.S. at 351.

Here, Boss fails to allege any actual injury as a result of the alleged denial of access to the law library.  He does not allege that he was unable to file this or any other complaint in the courts, and in fact, he has not been limited in filing the instant action, or his several other recent Complaints in this Court.  Consequently, the allegations in the Complaint are too conclusory to show a denial of court access sufficient to rise to the level of a constitutional deprivation under the Iqbal pleading standard.  "[T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation .... Nor does a complaint suffice if it tenders naked

assertions devoid of further factual enhancement." Iqbal, 129
S.Ct. at 1949 (citations and internal quotation marks omitted).

Furthermore, Boss does not articulate how the alleged denial
of access to the law library has hindered his efforts to either
pursue this claim or defend himself in any pending state
proceedings.  Therefore, his claim alleging denial of access to
the courts based on an alleged failure to provide access to the
law library will be dismissed without prejudice for failure to
state a claim at this time.

D.   Interruption of Treatment Claim

Boss also continues to assert that therapy/treatment
sessions are or will be denied because of the prison setting and
control by NJDOC officials over movements and conduct of the
residents in the EJSP STU.  Thus, Boss appears to argue that he
is denied the right to adequate treatment and reasonable care
applicable to civilly committed SVPs, in violation of the
Fourteenth Amendment.

The Fourteenth Amendment to the United States Constitution,
§ 1, guarantees that "[n]o State shall ... deprive any person of
life, liberty, or property, without due process of law."  This
due process guarantee has been interpreted to have both
procedural and substantive components, the latter which protects
fundamental rights that are so "implicit in the concept of
ordered liberty" that "neither liberty nor justice would exist if
they were sacrificed." Palko v. Conn., 302 U.S. 319, 325 (1937).
These fundamental rights include those guaranteed by the Bill of

Rights, as well as certain liberty and privacy interests implicitly protected by the Due Process Clause, such as the right to marry. Washington v. Glucksberg, 521 U.S. 702, 720 (1997). Substantive due process also protects against government conduct that is so egregious that it "shocks the conscience," even where the conduct does not implicate any specific fundamental right. See United States v. Salerno, 481 U.S. 739, 746 (1987).

Laws disturbing fundamental rights receive strict scrutiny and will be upheld if they are "narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 302 (1993). However, regulations not implicating fundamental rights (in other words, those claims attacking particularly egregious or arbitrary governmental actions) are analyzed under the deferential standard referred to as the rational basis review, and will generally succeed only if the government action shocks the conscience. See Glucksberg, 521 U.S. at 728.

With respect to Boss' claim, it appears that he is asserting that he has a fundamental right to adequate treatment as a civilly committed sex offender, and that as a result of the prison setting he is not being afforded adequate treatment. The Supreme Court established that there exists a constitutionally protected right of mentally retarded persons confined at a state institution to minimally adequate treatment. Specifically, the Supreme Court held that there is a constitutional right of mentally disabled persons confined at a state institution to "minimally adequate habilitation", self-care treatment or

training to the extent necessary to protect their recognized fundamental rights to safety and freedom from physical restraints. Youngberg, 457 U.S. at 316, 319 and 322.

The Supreme Court further held that, where a fundamental right is at issue, a district court must balance "the liberty of the individual and the demands of an organized society" to determine whether such right has been violated. Youngberg, 457 U.S. at 320. Although restrictions burdening a fundamental right generally receive strict scrutiny, in Youngberg, the Supreme Court found that this sort of rigorous analysis would unduly burden the ability of states, specifically their professional employees, to administer mental health institutions. Id. at 322. Consequently, the Court concluded that "the Constitution only requires that the courts make certain that professional judgment was in fact exercised," because "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Id. at 321 (internal quotation and citation omitted). Thus, a decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." Id. at 323.

In Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit held that New Jersey's unique former statutory scheme for sex offenders that

42

predicated the term of sentence on a prisoner's response to treatment and created a right to treatment created a fundamental and cognizable liberty interest in treatment, for purposes of both procedural and substantive due process analyses.  288 F.3d at 545.  Leamer was not a civilly committed sex offender like plaintiff here.  Rather, Leamer was a convicted sex offender whose confinement and treatment were inextricably linked pursuant to statute.  The sentencing court had classified Leamer as having a "mental aberration" and in need of "specialized treatment," which automatically subjected Leamer to the maximum incarceration permitted by law unless he is cured prior to that point.  Leamer could not reduce his sentence through good behavior credits, parole policies or other credits.  Instead, he could only shorten his incarceration through successful therapy, which was an "inherent and integral element" of the statutory scheme. Consequently, the Third Circuit found that deprivation of treatment would be a grievous loss not emanating from the sentence.  Leamer, 288 F.3d at 544.

Apart from that recognized in Youngberg to prevent the violation of recognized fundamental rights to safety and freedom from physical restraints, this Court finds the Third Circuit's holding in Leamer to clearly extend to an involuntarily committed sex offender under New Jersey's SVPA.  Like Leamer, the length of Lopez's confinement under the SVPA is predicated on his response to treatment.  Indeed, the provisions of the SVPA explicitly recognize New Jersey's obligation to provide treatment to SVPs

43

for their eventual release based on successful therapy.  See
N.J.S.A. 30:4-27.32(a)("If the court finds by clear and
convincing evidence that the person needs continued involuntary
commitment as a sexually violent predator, it shall issue an
order authorizing the involuntary commitment of the person to a
facility designated for the custody, care and **treatment** of
sexually violent predators")(emphasis added); N.J.S.A. 30:4-
34(b)("The Division of Mental Health Services in the Department
of Human Services shall provide or arrange for treatment for a
person committed pursuant to this act.  Such treatment shall be
appropriately tailored to address the specific needs of sexually
violent predators."); N.J.S.A. 30:4-27.36(a)(At any time during
the involuntary commitment of a person under this act, if the
person's treatment team determines that the person's mental
condition has so changed that the person is not likely to engage
in acts of sexual violence if released, the treatment team shall
recommend that the Department of Human Services authorize the
person to petition the court for discharge from involuntary
commitment status"); see also Kansas v. Hendricks, 521 U.S. 346,
367 (1997)(concluding from similarly-worded provisions of Kansas
SVP Act that "the State has a statutory obligation to provide
'care and treatment for [persons adjudged sexually dangerous]
designed to effect recovery ....")(alterations in
original)(internal citations omitted).

        Therefore, based on Youngberg and Leamer, this Court
concludes that Boss may have a fundamental liberty interest in

                                44

treatment, but has not stated a cognizable claim at this time for purposes of both procedural and substantive due process analyses. See Bailey v. Gardebring, 940 F.2d 1150, 1154 (8th Cir. 1991), cert. denied, 503 U.S. 952 (1992)(where the Eighth Circuit noted that Youngberg did not establish a right for the civilly committed to treatment per se; the Supreme Court only "held that the Constitution required only such 'minimally adequate training ... as may be reasonable in light of [the] liberty interest[ ] in safety and freedom from unreasonable restraints.'")(quoting Youngberg, 457 U.S. at 322).  In Bailey, the Eighth Circuit concluded that plaintiff had no right to "psychiatric treatment to overcome a 'sexual offender condition'"  because he "was neither in danger during his civil commitment nor was he subject to any restraints beyond the ordinary incidents of any involuntary confinement."  Id. at 1153, 1154.  Citing Bailey, district courts in the Eighth Circuit have since concluded that civilly committed sexual predators have no substantive due process right to mental health treatment, adequate or otherwise. See Semler v. Ludeman, 2010 WL 145275, at *26 (D. Minn. Jan. 8, 2010)("Because this Court has not recognized a constitutional right to effective 'treatment' in the context of civilly committed sex offenders, Plaintiffs [alleging substantive due process violations through ineffective treatment] have failed to allege a due process claim ....")(citing Nicolaison v. Ludeman, 2008 WL 508549, at *8 (D. Minn. Feb. 11, 2008)(finding, in ultimately concluding that involuntarily committed sex offender's

45

right to treatment is not "clearly established" for purposes of
28 U.S.C. § 2254(d)(1), that <u>Youngberg</u> "only recognized a right
to 'minimally adequate' treatment that reduces the need for
restraints," and not a "comparable right to treatment that
facilitates release")).

Indeed, based on the allegations and admissions by plaintiff
in his Complaint, Boss again has failed to show any procedural or
substantive due process violations at this time.  He does not
demonstrate a categorical denial of therapy due to the prison
setting in which he receives his treatment.  In <u>Leamer</u>, the Third
Circuit, relying on <u>Sandin</u>, found that Leamer would face
"significant obstacles" in establishing a procedural due process
claim based on his placement on RAP (restricted activities
program) status because the mere fact of placement in
administrative segregation is not in and of itself enough to
implicate a liberty interest.  <u>Leamer</u>, 288 F.3d at 546.
Similarly, in the instant case, although Boss and other
disruptive and agitative residents may be placed in MAP status in
response to their behavior or uncooperation, there is no
indication from the allegations here that these residents have
been or will be denied treatment.

Indeed, there are no factual allegations of an absolute
denial of treatment.  Rather, Boss merely alleges that prison
staff regulate movement and conduct searches and other policy
measures for the orderly running and security of the EJSP
facility as a whole, which Boss feels affects his access to

46

treatment sessions.  He does not allege that he has been denied
treatment.  Boss simply asserts legal conclusions in his
complaint about being made to feel like a "prisoner" rather than
a civilly committed person.  Indeed, he seems mostly fixated on
the idea of being in a "prison setting" and does not allege any
real disruption or interference with his treatment, except
through his own actions and discomfort in being in a "prison
setting."

This Court likewise finds no substantive due process
violation at this time.  Substantive due process prevents the
government from engaging in conduct that "shocks the conscience,"
or interferes with rights "implicit in the concept of ordered
liberty."  Glucksberg, 521 U.S. at 721.  Under this standard,
Defendants' actions in denying Boss his statutory right to
treatment will be found unconstitutional under the Fourteenth
Amendment if they were so arbitrary or egregious as to shock the
conscience.  See Leamer, 288 F.3d at 546-47 (substantive due
process claim alleging inadequate treatment for committed sex
offender "must focus on the challenged abuse of power by
officials in denying [the plaintiff] the treatment regimen that
was statutorily mandated and was necessary in order for his
condition to improve, and thus for him to advance toward
release").

Here, as demonstrated above, defendants have not
categorically declined to provide any mental health treatment to
Boss.  Thus, this Court cannot readily conclude that Defendants'

47

actions were conscience-shocking and in violation of Boss'
substantive due process rights.  Indeed, plaintiff's allegations,
as set forth above, are merely conclusory and factually
unsubstantiated.  Boss has not shown any disruption of treatment.
Instead, he simply objects to the manner and place in which
treatment and sessions are provided.

Thus, the Court concludes that treatment has not been denied
to the SVP residents, or more particularly Boss, as alleged
because there is no demonstrated interruption of adequate
treatment that would rise to the level of a constitutional due
process deprivation as alleged.  Further, this Court concludes
that the allegations asserted in Boss' Complaints do not show
such egregious conduct or disruption as to render mental
treatment at EJSP conscience-shockingly deficient.

Accordingly, Boss' claim alleging inadequate treatment will
be dismissed without prejudice for failure to state a cognizable
claim of a deprivation of a constitutional right at this time.

E.  Preliminary Injunction

Finally, Boss brings an application for a preliminary
injunction to prevent defendants from retaliating against him by
confiscating his legal materials or placing him in MAP for
bringing this action.

To secure the extraordinary relief of a preliminary
injunction or TRO, plaintiff must demonstrate that "(1) he is
likely to succeed on the merits; (2) denial will result in
irreparable harm; (3) granting the injunction will not result in

irreparable harm to the defendants]; and (4) granting the
injunction is in the public interest." Maldonado v. Houston, 157
F.3d 179, 184 (3d Cir. 1998), cert. denied, 526 U.S. 1130
(1999)(as to a preliminary injunction); see also Ballas v.
Tedesco, 41 F. Supp.2d 531, 537 (D.N.J. 1999) (as to temporary
restraining order).  A plaintiff must establish that all four
factors favor preliminary relief.  Opticians Ass'n of America v.
Independent Opticians of America, 920 F.2d 187 (3d Cir. 1990).
The standards for a permanent injunction are essentially the same
as for a preliminary injunction, except that the plaintiff must
show actual success on the merits, not a likelihood of success,
to obtain a permanent injunction.  See University of Texas v.
Camenisch, 451 U.S. 390, 392 (1981).

Here, the claims asserted in this Complaint are being
dismissed for failure to state a claim at this time.
Accordingly, Boss has not alleged facts sufficient to satisfy the
first requirement that he may be likely to succeed on the merits.
Moreover, Boss fails to articulate irreparable harm, and thus,
cannot satisfy the second mandatory requirement.

Therefore, because Boss is unable to establish all four
factors necessary for preliminary injunctive relief as required,
his application for preliminary injunctive relief will be denied.

V.   CONCLUSION

For the reasons set forth above, plaintiff's Complaint will
be dismissed without prejudice, in its entirety as against all
named defendants, for failure to state a claim at this time,

49

pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  Plaintiff may seek

leave to re-open this case to file an amended pleading to the

extent he can allege facts to cure the deficiencies noted herein.

Finally, his application for a preliminary injunction will be

denied.  An appropriate order follows.


/s/ Jose L. Linares
JOSE L. LINARES
United States District Judge